UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA M. BARBERA,

        Plaintiff,                        Civil Action No. 11-cv-13265

      v.                               District Judge Thomas L. Ludington
                                       Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15, 18]**

Plaintiff Linda Barbera brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 15, 18), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 3).

## I. RECOMMENDATION

For the reasons set forth below, this Court finds that the Administrative Law Judge failed to adequately explain why Plaintiff's impairments do not meet or medically equal Listing 1.04A and why he credited two physicians opinions yet did not adopt certain Plaintiff-favorable functional limitations in those opinions. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

On February 15, 2007, Plaintiff filed an application for period of disability and disability insurance benefits asserting that she became unable to work on April 18, 2006. (Tr. 140.) The Commissioner initially denied Plaintiff's disability application on May 2, 2007. (Tr. 140.) Plaintiff then filed a request for an administrative hearing.

On May 5, 2009, she appeared before Administrative Law Judge ("ALJ") Jerome Blum, who considered the case *de novo*. (Tr. 63-100, 140-48.) In a July 20, 2009 decision, ALJ Blum found that Plaintiff was not disabled. (Tr. 140-47.) Plaintiff appealed ALJ Blum's decision, and, on May 20, 2010, the Appeals Council remanded the case to obtain treating-source records, give further consideration to Plaintiff's residual functional capacity, and to obtain supplemental evidence from a vocational expert. (Tr. 151; *see also* Tr. 150.)

Plaintiff's case was remanded to ALJ Gregory Holiday. On January 25, 2011, Plaintiff appeared with counsel for an administrative hearing before ALJ Holiday. (Tr. 102-35.) On February 4, 2011, ALJ Holiday found that Plaintiff was not disabled. (Tr. 17-32.) On June 9, 2011, the Appeals Council denied Plaintiff's request to review ALJ Holiday's decision.

Plaintiff filed suit in this Court on July 27, 2011. (Dkt. 1.)[1]

### B. Background

Plaintiff was 44 years old on her alleged disability onset date and 49 years old when ALJ Holiday issued his decision. (*See* Tr. 215). She has a high-school education. (Tr. 106.) Her prior

_____

[1]It appears that Plaintiff is now receiving disability benefits for the period beginning April 5, 2011. (Def.'s Mot. Summ. J. at ECF Pg ID 849-60.)

experience includes working for the United States Postal Service and then line work for an automotive company. (Tr. 116.) Plaintiff said that she stopped working for the automotive company because of problems with her hands and legs. (Tr. 117.)

### 1. Plaintiff's Testimony at the Hearing Before the ALJ

At her administrative hearing before ALJ Holiday, Plaintiff testified to neck and back issues, problems with her hands and knees, gout, diabetes, and depression. Regarding her back, Plaintiff stated that while she did not know the correct medical terminology, she had "slipped discs and nerve damage." (Tr. 107.) Plaintiff said that her low-back pain was severe and that she could not (apparently because of insurance reasons) obtain medication for it. (Tr. 112.) Plaintiff said that her carpal tunnel syndrome had worsened, and that "[i]t's so bad that my hands go numb[;] [t]hey're burning, stinging[;] I can't sleep at night." (Tr. 111.) Plaintiff told the ALJ that she wore wrist braces every night. (Tr. 112.) Plaintiff also said that she had "a lot of [gout] flare-ups." (Tr. 111.) Plaintiff thought her gout had "gone into [her] ankle." (*Id.*)

Regarding her depression, Plaintiff said,

> I'm severely depressed, and I can't afford the treatment I need. I just want to sleep from morning to day. I'm not active. I don't do anything. I gained a lot of weight because I hurt, I'm in pain, and I can't sleep well. I can't get the pain medication I need. So I'm constantly tired and all I want to do is sleep. And it's hard to function. It was hard even coming here today.

(Tr. 108.) She also testified that she had gained 60 pounds since being off work; at the time of the hearing she weighed 200 pounds. (Tr. 113.)

In terms of activities of daily living, Plaintiff stated that she cooks "[v]ery rarely," does some shopping, and does "[v]ery little" housework. (Tr. 115.) When she goes shopping, Plaintiff said that she uses the cart to help her walk. (Tr. 120.) She stated that she is only able to lift about a half-

3

gallon of milk because of the strength in her hands. (Tr. 119.) Plaintiff stated that she could sit for about 30-40 minutes without being in severe pain. (*Id.*) Plaintiff also testified that she could only stand for "a few minutes" before her legs would give out, and that she could walk "2-3 houses down" before she loses her breath and has to sit down. (*Id.*) On a good day, Plaintiff said her pain was at the 7-out-of-10 level, but on a bad day "[l]ike a 10 plus." (Tr. 121-22.)

### 2. Medical Evidence

In support of this appeal, Plaintiff primarily relies on medical records post-dating a motor vehicle accident in February 2009. The Court briefly discusses the earlier medical evidence in the administrative record.

### (a) Pre-February 2009 Medical Evidence

Plaintiff's primary-care physician from 2001 through at least June 2008 was Dr. Jeffery Herman. (Tr. 530.) On or around June 27, 2006, Dr. Herman completed an Attending Physician's Statement of Disability. (Tr. 508-09.) Dr. Herman noted that Plaintiff had been absent from work since June 8, 2006, and provided diagnoses of diabetes, feet pain, nausea, fatigue, hypertension, and nocturia. (Tr. 509.) He also noted that Plaintiff would be referred for a sleep evaluation. (Tr. 509.)

In September 2006, Dr. Jack Belen, on referral from Dr. Herman, reviewed the results of a sleep study. (Tr. 375.) He found that Plaintiff had sleep apnea and prescribed a CPAP machine. (*Id.*)

In November 2006, Dr. Herman provided that Plaintiff could return to work – but only for four hours per day. (Tr. 451.) He noted that Plaintiff was a line worker and that she could not perform the associated standing and bending for an eight-hour period. (Tr. 451.)

In March 2007, Dr. Herman wrote a letter to Plaintiff's health-care insurer. (Tr. 443.) He

provided:

> Linda [Barbera] is a type 2 diabetic, who suffers from multiple problems. She has peripheral neuropathy as well as a lumbar radiculopathy, both of which result in a chronic pain syndrome. Additionally, she has profound fatigue related to recent diagnosis of obstructive sleep apnea. She is currently undergoing treatment for this condition, but unfortunately has failed to recognize any improvement in her energy level or level of function. As a result of these problems, Linda has been off work for an extended period of time.

(Tr. 443.)

Also in March 2007, Dr. Steven Arbit, on referral from Dr. Herman, evaluated Plaintiff for the first time. It was Dr. Arbit's opinion that Plaintiff had "a couple of different things going on." (Tr. 405.) Dr. Arbit stated that Plaintiff had tennis elbow, back and leg pain without evidence of radiculopathy, bilateral carpal tunnel syndrome, and "just some multiple medical problems." (*Id.*) He provided Plaintiff with an elbow injection and ordered a course of physical therapy. (*Id.*) The next month, Dr. Arbit found that Plaintiff had "14 of the fibromyalgia tender points" but his notes do not explicitly diagnose fibromyalgia. (Tr. 395.) In June 2007, Dr. Arbit noted that Plaintiff continued to have elbow problems; he gave Plaintiff another cortisone injection. (Tr. 393.) In August 2007, Dr. Arbit found that an EMG of the left-upper extremity was abnormal and evidenced carpal tunnel syndrome. (Tr. 575.) The study did not evidence cervical radiculopathy or peripheral polyneuropathy, however. (*Id.*) He provided an exercise program for carpal tunnel syndrome, prescribed wrist splints, and started Plaintiff on Lyrica for fibromyalgia syndrome. (Tr. 575.)

In February 2008, Dr. Belen reported that Plaintiff was doing "extremely well on her CPAP device." (Tr. 515.) Plaintiff reported that her daytime fatigue and hypersomnolence persisted, however. (*Id.*) Dr. Belen continued Plaintiff on her CPAP and suggested a prescription and

provided samples of Provigil.  (Tr. 516.)

*(b) Medical Evidence Pertaining to Plaintiff's Spine*

There is limited objective medical evidence of back problems prior to February 2009 in the administrative record.  An April 2006 chest x-ray revealed "degenerative changes" in the thoracic spine.  (Tr. 330.)  A July 2006 EMG study evidenced "left L5 radiculopathy which is subacute." (Tr. 337.)  As noted by a physician in December 2009, "The patient has [a] history of back problems that date all the way to 2006 when she was diagnosed with sciatica.  She was having back pain periodically on and off with activity although according to the patient [it has been] significantly worse since the [February 12, 2009 motor vehicle] accident."  (Tr. 627.)

Plaintiff was rear-ended on February 12, 2009.  (Tr. 662.)  She did not receive emergency medical treatment.  (Tr. 662.)  But pain developed in her neck and lower back in the days that followed, and on February 15, 2009, Plaintiff went to the emergency room.  (*Id.*)  Plaintiff recalled being discharged with prescriptions for Motrin and Vicodin.  (*Id.*)

On March 12, 2009, Plaintiff saw Dr. Promita Roychoudhury (at an outpatient charity clinic) for a follow-up exam.  (Tr. 578-79; *see also* Tr. 662.)  Plaintiff complained of pain in her neck muscles radiating into her arms.  (Tr. 579.)  She also stated that her low back pain had worsened. (*Id.*)  Dr. Roychoudhury prescribed Motrin and physical therapy.  (Tr. 578.)

On June 18, 2009, Plaintiff underwent an MRA of her neck and an MRI of her lumbar spine. Regarding her cervical spine, the interpreting physician found "some focal disc bulging to the right" at C3-C4 which "minimally impinges on the right C3-C4 neuroforamen," mild spondylotic changes at C5-C6, and a "mild broad-based bulge and spur causing mild bilateral forminal narrowing without

significant central narrowing or cord compression" at C6-C7.  (Tr. 591.)[2]  Regarding her lumbar

spine, Plaintiff had "mild bilateral foraminal narrowing without central involvement" at L4-L5 and

"mild bilateral foraminal encroachment without central narrowing" at L5-S1.  (Tr. 592.)

     Plaintiff began seeing Dr. Alan Robertson, an orthopedist, on November 5, 2009 for the

injuries she received in the February 2009 motor vehicle accident.  (Tr. 662-71.)  She reported that

her neck was "really sore" and prevented sleeping at night, and that pain radiated down her left arm

and caused numbness.  (Tr. 663.)  She informed Dr. Robertson that she had numbness in the fingers

of both hands but also acknowledged her carpal tunnel syndrome.  (*Id.*)  Regarding her lower back,

Plaintiff reported that "it burns when I bend down I have a hard time getting up [*sic*] and when I get

up in the morning I'm like crippled."  (*Id.*)  She told Dr. Robertson that she had a history of lower-

back pain but no history of neck problems similar to those she experienced since the 2009 accident.

(*Id.*)  Dr. Robertson reviewed the June 2009 imaging study and, while noting that the study was

"[t]echnically compromised" due to the use of a low-strength magnet, Plaintiff had a

"[n]eurocompressive disc extrusion paracentrally toward the left of midline at the C6-7 level."  (Tr.

665-66.)  On exam, Dr. Robertson found that Plaintiff's neck extensors were in symmetrical spasm

and that Plaintiff's range of motion was 50% of the expected range.  (Tr. 668.)  He also found that

Plaintiff's right triceps response was "brisk at +2" but the left was "absent."  (Tr. 667.)  Upon

---

[2]The spinal column is comprised of vertebrae separated by discs that act as cushions between the vertebrae.  The *central canal* of the spinal column conveys the spinal cord.  At each disc level, e.g., C6-C7, a pair of spinal nerves exit the canal via *neural foramen* and thereby pass into the arms or legs.  Joseph T. Alexander, M.D., Assistant Professor of Neurosurgery for Mayo Medical School, *Lumbar Spinal Stenosis: Diagnosis and Treatment Options* (June 1999); The Cleveland Clinic, *Lumbar Canal Stenosis*, http://my.clevelandclinic.org/disorders/stenosis_spinal/ hic_lumbar_canal_stenosis.aspx (visited May 22, 2012); Randy Shelerud, Mayo Clinic Physical Medicine Specialist, *Herniated Disk*, http://www.mayoclinic.com/health/ bulging-disk/AN00272 (visited May 23, 2012).

manual testing of her upper extremity muscle strength, however, Dr. Robertson found no asymmetrical weakness. (*Id.*) Seated straight leg raising reveled no withdrawal response. (Tr. 667.) Dr. Robertson arranged for a more sensitive imaging study and prescribed Hydrocodone and ibuprofen. (Tr. 669-70.) He also provided that Plaintiff required household assistance/replacement services. (Tr. 670.)

On November 7, 2009, Dr. Bharat Mehta, on referral from Dr. Robertson, performed a cervical spine MRI. (Tr. 616-17.) Plaintiff reported a loss of feeling in her left arm and believed that she had been dropping a lot of things. (*Id.*) Dr. Mehta's impressions were disc herniation in the left C4 neural foramen, disc herniation in the right C6 neural foramen, mild cord compression at C6-C7 level, and herniation in the left T1 neural foramen. (Tr. 617.)

On November 19, 2009, Dr. Anthony Bennett performed CT scans of Plaintiff's cervical and lumbar spine. (Tr. 620-22.) Regarding Plaintiff's cervical spine, he found "multilevel bilateral neural foraminal encroachment particularly on the left at C3-C4 and to a lesser extent C4-C5 and bilaterally C5-C6 and C6-C7." (Tr. 621.) The CT suggested "diffuse disc bulging," but not disc herniation or "high-grade" central canal stenosis. (Tr. 621.)[3] As for the lumbar CT scan, Dr. Bennet

---

[3]According to the Mayo Clinic website,

> A bulging disk extends outside the space it should normally occupy. The bulge typically affects a large portion of the disk, so it may look a little like a hamburger that's too big for its bun. The part of the disk that's bulging is typically the tough outer layer of cartilage. Usually bulging is considered part of the normal aging process of the disk and is common to see on MRIs of people in almost every age group.

> A herniated disk, on the other hand, results when a crack in the tough outer layer of cartilage allows some of the softer inner cartilage to protrude out of the disk. The protrusion of inner cartilage in a herniated disk usually happens in one distinct area of the disk and not along a large component of the disk, which is more typical of a

provided that Plaintiff had "mild encroachment of the anterior epidural space and bilateral symmetric inferior nerve root recesses, greatest involvement at L4-[L5] and L5-S1." (Tr. 622.) As with the cervical spine study, Dr. Bennett noted diffuse disc bulging but "[n]o focal disc protrusion to suggest disc herniation." (*Id.*)

On November 20, 2009, Dr. Henry Tong, also on referral from Dr. Robertson, performed an EMG on Plaintiff's arms. The results of the exam were abnormal. (Tr. 595.) Dr. Tong found that "[t]here is electrodiagnostic evidence of a left subacute C6-7 radiculopathy." (*Id.*) He also found evidence of bilateral "moderate severity" carpal tunnel syndrome. (*Id.*)

On November 30, 2009, Plaintiff returned for a follow-up exam with Dr. Robertson. (Tr. 650.) The exam included a careful review of the recent imaging studies. (*See* Tr. 651-53.) Regarding the November 7 and November 19, 2009 imaging studies of Plaintiff's cervical spine, Dr. Robertson's impression was "[g]lobal spinal canal stenosis and bilateral nerve root canal stenosis" at C3-C4 and "[l]eft paracentral disc extrusion, C6-7 compressing upon the C7 nerve root." (Tr. 651.) Upon reviewing the lumbar-spine study, Dr. Robertson concluded, "[o]steoarthrosis involving the zygapophyseal joints bilaterally." (Tr. 653.) He advised Plaintiff to avoid activities that would place a load on her musculoskeletal system and provided that she required household assistance/replacement services. (Tr. 654.) Dr. Robertson scheduled a follow-up exam.

Plaintiff returned to Dr. Robertson about a week later. (Tr. 646.) He provided that Plaintiff had been recalcitrant to conservative treatment, and remarked,

---

bulging disk. Herniated disks are also called ruptured disks or slipped disks.

Randy Shelerud, Mayo Clinic Physical Medicine Specialist, *Herniated Disk*, http://www.mayoclinic.com/health/ bulging-disk/AN00272 (visited May 23, 2012).

> I believe that Ms. Barbera would best be served by "[a]nterior cervical discectomy and fusion at the C6-7 level. I no longer perform major surgery and as such I am going to refer Ms. Barbera to Miguel Lis-Planells, MD for his neurosurgical thoughts.

(Tr. 646.)

On December 19, 2009, Dr. Lis-Planells, a neurosurgeon, evaluated Plaintiff. Plaintiff reported neck and lower back pain at the 8-out-of-10 level. (Tr. 627.) She also complained of pain radiating to her left shoulder and the lateral aspect of the left arm and weakness in the left hand. (Tr. 627.) She also reported paresthesias affecting both hands and feet, but Dr. Lis-Planells noted a history of "noninsulin dependent diabetes." (Tr. 627.) On exam, Dr. Lis-Planells found that Plaintiff had "left-sided trapezial muscle spasm with positive left Spurling." (Tr. 628.) He also found that Plaintiff had limited range of movement in her lumbar spine but that her straight-leg test was negative. He reviewed Plaintiff's November 7, 2009 cervical MRI and noted, "herniated disc at C3-C4 and significant herniation at C6-C7 with central cord compression . . . . There is evidence of cord deformity at C6-C7 ventrally." (Tr. 628.) Dr. Lis-Planells concluded, "Ms. Barbera presents with cervical radiculopathy secondary to a C6-C7 herniated disc. After three months of physical therapy, she has [the] possibility of considering additional surgery versus epidural injection." (Tr. 628.)

On December 30, 2009, Dr. Peter Nefcy, on referral from Dr. Lis-Planells, performed MRI studies of Plaintiff's lumbar spine. (Tr. 630-31.) He found "mild impingement upon the neural foramen bilaterally at the L3-4 and L4-5 levels," mild diffuse disc bulging and "the suggestion of a small disc herniation" at L5-S1, and a moderate impingement upon the neural foramen bilaterally at L5-S1. (Tr. 631.) Dr. Nefcy also took an MRI of Plaintiff's thoracic spine. (Tr. 632-33.) That study revealed a number of small focal disc herniations. (Tr. 632.) At C7-T1 there was a "mild to

10

moderate impingement upon the right neural foramen." (*Id.*)  Additionally, Dr. Nefcy noted "borderline spinal stenosis at the T7-8 and T8-9 disc levels," with mild impingements upon the neural foramen at T7-T8 and T8-T9.  (Tr. 633.)

On January 5, 2012, Plaintiff returned to Dr. Robertson.  (Tr. 639-40.)  Dr. Robertson had not spoken with Dr. Lis-Planells but Plaintiff informed Dr. Robertson of their discussion of surgery versus epidural shots.  (Tr. 639.)  Plaintiff told Dr. Robertson that she was hesitant to undergo the shots because of her diabetes; Dr. Robertson noted, "I do not believe that Ms. Barbera should be overly concerned [about that] especially [since] she is not insulin dependent."  (Tr. 640.)  Dr. Robertson continued to advise Plaintiff to avoid placing a load on her musculoskeletal system and maintained that she required household assistance/replacement services.  (*Id.*)

On January 7, 2010, Dr. Robertson completed a Medical Needs form for Michigan's Department of Health and Human Services.  (Tr. 596-98.)  Dr. Robertson provided that Plaintiff could not work any job and that her limitations were expected to last more than 90 days.  (Tr. 597.)  Dr. Robertson did not complete the functional assessment portion of the form, however, instead noting "see attached."  (Tr. 597.)

On January 21, 2010, Plaintiff returned to Dr. Robertson for another follow-up.  (Tr. 634-37.)  Plaintiff reported that her low-back pain was much worse than her neck situation.  (Tr. 634.)  Dr. Robertson reviewed the December 30, 2009 MRI of Plaintiff's lumbar spine.  (Tr. 634.)  His impression was, "Bilateral nerve root canal stenosis at the L4-5 and to a greater extent the L5-S1 levels."  (*Id.*)  On exam, Dr. Robertson found that "Ms. Barbera does not allow for any movement of her lower back, regardless of the plane of movement, stating that same is very painful to her. There is considerable spasm involving the paraspinal extensors bilaterally."  (Tr. 635.)

11

Plaintiff did not see Dr. Robertson for about a year.  In January 2011, Dr. Robertson explained,

> I was in the process of arranging for surgical decompression and stabilization however Ms. Barbera was evaluated by insurance "independent" examiner who opined that Ms. Barbera's injuries all predated the 02-21-09 collision and could not have been exacerbated or accelerated secondary the collisions.  Absent insurance benefits, I could not move forward and as such Ms. Barbera discontinued treating.

(Tr. 727.)[4]  Dr. Robertson performed a physical examination and found "[n]o distinct motor weakness about the four-extremity flexors as well as extensors."  (*Id.*)  He noted muscle spasm in Plaintiff's lower back and that her range of motion was reduced by 25%.  (*Id.*)  He advised Plaintiff that to move forward with surgery, he would require updated MRI and EMG studies.  (Tr. 728.)

### (c) Medical Evidence Relating to Plaintiff's Mental Impairments

On May 6, 2009, Plaintiff underwent a 30-minute psychological evaluation with Dr. Bernadette Angeles.  (Tr. 582.)  Plaintiff reported receiving a closed head injury in a 1994 motor vehicle accident; according to Plaintiff, she was diagnosed with a cognitive disturbance and memory impairment that prevented her from continuing work at the post office.  (Plaintiff subsequently worked in production for about eight years. (Tr. 241.))  Plaintiff reported significant depression over the past two years and that she had difficulty focusing.  (Tr. 582.)  Upon performing a mental-status exam, Dr. Angeles found that Plaintiff's mood was depressed, her thought process was "mildly circumstantial," her concentration was mild-to-moderately impaired, and her memory was mildly impaired.  (Tr. 583.)  Her diagnosis included major depression, recurrent, moderate and cognitive

---

[4]At her administrative hearing, Plaintiff said that she went to Dr. Robertson "to get an update since I haven't been to see any special doctors.  And he was willing to see me to give an update since I can't even treat with him because I don't have the insurance right now to do so."  (Tr. 109.)

impairment due to closed head injury.  (Tr. 584.)

On June 8, 2009, Ms. Barbara Moir, LLP conducted a neuropsychological assessment.  (Tr. 587-90.)  It appears Dr. Kenneth Podell, a neuropsychologist, aided Ms. Moir with her assessment or otherwise reviewed it.  (*See* Tr. 590.)  Plaintiff reported having cognitive problems since her 1994 automotive accident, but said that she had learned to cope and "to really focus."  (Tr. 587.)  Plaintiff told Ms. Moir that, after the 2009 motor vehicle accident, her memory had worsened and that she had also experienced other cognitive problems.  (Tr. 587.)  Ms. Moir conducted a litany of tests on Plaintiff.  (Tr. 588.)  Plaintiff's attention and memory abilities were variable.  (Tr. 589.)  For instance, Plaintiff's forward and reverse digits testing was in the borderline range but her working memory, "the most complex aspect of attention and concentration," was average.  (Tr. 589.)  Plaintiff also completed a personality questionnaire, and Ms. Moir found that Plaintiff's "scores on various scales reveal symptom over-reporting suggesting significant emotional distress and psychopathology."  (Tr. 589.)  Further, because of Plaintiff's "inconsistent motivation," Ms. Moir noted that the test results "likely do not reflect her true cognitive abilities."  (Tr. 590.)  Ms. Moir explained,

> It is difficult to interpret the tests because of the inconsistency evident in the level of impairment, variable effort in testing, her report [*sic*] and demeanor, and the [medical] history.  We believe that psychopathology plays a prominent role at this time and in all likelihood prevents her from normal daily functioning. . . .  Given the level of chronic psychopathology[,] . . . and reported history of significant [traumatic brain injury] in 1994, there may be cognitive deficits; however, we can not make that determination at this time based on the obtained level of performance. . . . We note that a Social Security Disability decision is pending; however, we do not believe there is any overt  attempt at malingering; rather, the results are a reflection of a likely long-standing factitious disorder.  Because of this, all medical treatment should be based upon objective findings and not just subjective complaints.

13

(Tr. 590.) Ms. Moir, and apparently Dr. Podell, diagnosed Plaintiff with pain disorder with medical and psychological factors, major depressive disorder, recurrent, Cluster B personality features, and indicated that factitious disorder and avoidant personality disorder should be ruled out.  (Tr. 590.)

In August 2009, Dr. Angeles completed a Mental Health Source Document.  (Tr. 618.)  She provided that Plaintiff's symptoms were "frequently" severe enough to interfere with her ability to work with others, that Plaintiff had "moderate" limitations in dealing with work stress, and that Plaintiff was "frequently" limited in her ability to "focus, organize, [and timely] complete work tasks."  (*Id.*)  Dr. Angeles also provided that Plaintiff would likely need to be absent from work three times per month because of her impairments.  (*Id.*)

### 3.  Vocational Expert's Testimony at the Hearing Before the ALJ

A vocational expert ("VE") testified about job availability for hypothetical individuals with functional limitations approximating Plaintiff's limitations.  The ALJ asked the VE to consider a person of Plaintiff's age, education, and work experience who could perform light work and

> [t]he person requires a sit/stand option.  The person can perform not more than occasional pushing and pulling; cannot climb ladders, ropes or scaffolds; can only occasionally climb ramps, stairs; occasional balancing, occasional stooping–this is partial stooping not all the way down–occasional crouching, kneeling, crawling, reaching with no reaching [above] a 27 inch height [while seated].[5] . . .  Only occasional overhead reaching and handling.  However, none with the left arm. Occasional gross manipulation and fine manipulation. . . . [Must] avoid[] all use of moving machinery and exposure to unprotected heights. In addition, this person has to work in a low-stress job defined as having not more than occasional decision making and occasional changes in the work setting.

---

[5]The ALJ originally stated "below" but sought clarification from Plaintiff and amended the hypothetical.  (Tr. 128-29.)

(Tr. 127-28.)  The VE responded that there would be light, unskilled jobs that the hypothetical individual could perform such as 2,000 counter rental clerk jobs regionally and 200,000 nationally. (Tr. 127, 129.)

The ALJ then asked the VE to consider the same hypothetical individual

> except this person can perform at not more than the sedentary level lifting and carrying not more than 10 pounds. In addition, while the person can stand or walk for approximately two hours in an eight-hour workday, the person can only stand not more than 30 minutes at a time.  Similarly, the person can only sit up to 30 minutes at a time.  So that person requires a sit/stand option. . . .  The person can perform not more than brief stooping, this is partial stooping not all the way down. By brief, I mean not more than 10 percent of the workday. Not more than brief crouching or kneeling or crawling.

(Tr. 130.)  The VE testified that the individual could perform sedentary, unskilled work as a surveillance system monitor and that there would be 1,000 positions regionally and 50,000 nationally.  (Tr. 131.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, ALJ Holiday found that Plaintiff has not engaged in substantial gainful activity since April 18, 2006, Plaintiff's alleged onset date. (Tr. 20.) At step two, he found that Plaintiff had the following severe impairments: degenerative disc disease, lumbar radiculopathy, bilateral carpal tunnel syndrome, sleep apnea, gout, and major depressive disorder.  (Tr. 20.)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 21.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

16

sedentary work as defined in 20 CFR 404.1567(a) except the claimant can lift or carry 10 pounds frequently and 10 pounds occasionally (from very little, up to 1/3 of an 8-hour workday); the claimant can stand and/or walk (with normal breaks) for a total of 2 hours in an 8-hour workday, but only for 30 minutes at a time; the claimant can sit (with normal breaks) for a total of 6 hours in an 8-hour workday, but only for 30 minutes at a time; the claimant requires a sit/stand option at the workstation while remaining at the workstation (option means that the individual can sit/stand at will while performing assigned duties); can push or pull not more than occasionally (up to 1/3 of an 8-hour work day); cannot climb ladders, ropes or scaffolds; can only occasionally climb ramps or stairs; occasionally balance; can perform not more than brief (up to 10% of an 8-hour work day) partial stooping; can perform not more than brief crouching, kneeling, or crawling; can perform not more than occasional reaching and none above 27" high, while in a seated position; can perform not more than occasional overhead reaching, handling (and none with the left arm), gross manipulation and fine manipulation; must avoid all use of moving machinery and exposure to unprotected heights; work must be limited to a low-stress job, defined as having only occasional decision making and occasional changes in the work setting.

(Tr. 22.)  At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 30.)  At step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform: surveillance system monitor. (Tr. 31.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an

agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  Further, this Court does "not try the case de novo, resolve conflicts in

18

evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F. Analysis

#### 1. Plaintiff Has Not Sufficiently Shown That the ALJ's Procedural Error At Step Three Prejudiced Her Claim on the Merits

Plaintiff first argues that the ALJ erred at step three. (Pl.'s Mot. Summ. J. at 11-15.) Plaintiff says that substantial evidence does not support the ALJ's conclusion that her limitations do not meet or medically equal Listing 1.04A for spinal disorders. (*See id.* at 11, 15.) Plaintiff also argues that the ALJ committed procedural error by failing to (1) explain why she did not meet Listing 1.04A and (2) consider that Listing in combination with her obesity, *see* S.S.R. 02-1p, and major depression. (*See id.* at 12, 14-15.) The Court begins with the alleged procedural errors.

In *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011) the Sixth Circuit reversed the district court's affirmance of the ALJ's decision because the ALJ did not explain why the claimant did not meet or medically equal Listing 1.04. The ALJ began his step-three analysis by stating "'Claimant does not have an impairment or combination of impairments which, alone or in combination, meet sections 1.00 or 12.00 of the Listings.'" *Id.* at 415. But then, instead of analyzing the elements under Listing 1.04,[6] the ALJ simply proceeded to analyze the "B criteria"

_____

[6]Listing 1.04 provides, in relevant part:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine,

associated with the mental-disorder listings (Listing 12.04). *Id.* The Sixth Circuit held that the lack

of analysis of the listing corresponding to the claimant's spine was error warranting remand:

> Ultimately, the ALJ erred by failing to analyze Reynolds' physical condition in relation to the Listed Impairments. Put simply, he skipped an entire step of the necessary analysis. He was required to assess whether Reynolds met or equaled a Listed Impairment (such as the one above), but did not do so. . . .
>
> The ALJ's error was not harmless, for the regulations indicate that if a person is found to meet a Listed Impairment, they are disabled within the meaning of the regulations and are entitled to benefits; no more analysis is necessary. 20 C.F.R. § 404.1520(a)(4)(iii). Therefore, if the ALJ had properly analyzed Step Three, and had found Reynolds met Listing 1.04, she would receive benefits regardless of what the ALJ's conclusion would have been at Steps Four and Five. Additionally, in this case, correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence Reynolds put forth could meet this listing.
>
> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence. *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d Cir. 2000). As the Third Circuit explained, "[b]ecause we have no way to review the ALJ's hopelessly inadequate step three ruling, we will vacate and remand the case for a discussion of the evidence and an explanation of reasoning" supporting the determination that Reynolds' severe impairments do not meet or medically equal a listed impairment. *Burnett*, 220 F.3d at 120.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011); *see also Clifton v. Chater*,

---

motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); . . .
20 C.F.R. Pt. 404, Subpt. P, Appx. 1.

79 F.3d 1007, 1009 (10th Cir. 1996) ("In this case, the ALJ did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment. . . .  Such a bare conclusion is beyond meaningful judicial review.").

Here, as in *Reynolds*, the ALJ similarly provided:

> Although the claimant has the severe impairments listed above, the impairments, or combination of impairments, do not meet or medically equal the specific criteria of 1.00 Musculoskeletal Systems, 4.00 Respiratory, 11.00 Neurological, 12.00 Mental Disorders, 14.00 Immune System Disorders, or any impairment listed in Appendix 1, Subpart P, Regulations No.4.  The medical opinion of the State agency and consultative physicians, all of whom considered the relevant Listings, support this finding.

(Tr. 21.)  The ALJ then went on to analyze the four "B criteria" associated with Listing 12.04 in some detail.  But, as in *Reynolds*, the ALJ did not circle back to provide any analysis of the elements of Listing 1.04.  (Tr. 21-22.)  This is despite elsewhere recognizing Plaintiff's mild spinal cord compression at the C6-C7 level and electrodiagnostic evidence of C6-C7 radiculopathy.  (Tr. 28.)  Instead, the ALJ left it for this Court to speculate as to which of the several elements of Listing 1.04A the ALJ believed were not met.

Despite the fact that Plaintiff spends nearly a page of her brief on *Reynolds* (Pl.'s Mot. Summ. J. at 14-15), the Commissioner does not discuss the case (*see* Def.'s Mot. Summ. J. at 4-6).  Instead, the Commissioner asserts that the following elements of Listing 1.04A are not met: "nerve root compression characterized by [1] neuro-anatomic distribution of pain, . . . [2a] motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by [2b] sensory or reflex loss and, [3] if there is involvement of the lower back, positive straight-leg raising test (sitting

and supine)," Listing 1.04A, 20 C.F.R. Pt. 404, Subpt. P, Appx. 1. (*See* Def.'s Mot. Summ. J. at

4.)  In particular, the Commissioner argues:

> While she had pain, she reported pain in a number of places, and no
> record demonstrates that her pain was neuro-anatomically distributed.
> [For pain to be distributed in a neuro-anatomic distribution, it should
> correspond to the area enervated by a specific nerve root in the
> spine.][7]  Her motor loss and reflex loss are likewise diffuse; they do
> not "characterize[]" a specific nerve root compression.

(Def.'s Mot. Summ. J. at 4.)

Given that the Commissioner makes no effort to discuss *Reynolds*,  the ALJ's clear failure

to comply with the procedural requirements set forth by that case, and that "correction of such an

error is not merely a formalistic matter of procedure, for it is possible that the evidence [claimant]

put forth could meet [or medically equal] this listing,"  424 F. App'x at 416, the Court finds that

remand is warranted.  As  summarized in detail above, Drs. Mehta, Lis-Planells, and Robertson all

reviewed MRIs of Plaintiff's cervical spine and concluded that Plaintiff had nerve root and/or spinal

cord compression at the C6-C7 level.  (Tr. 617, 628, 651.)  In November 2009, Dr. Tong completed

an EMG and found "electrodiagnostic evidence of a left subacute C6-7 radiculopathy."  (Tr. 595.)

Dr. Lis-Planells also found that Plaintiff had "left-sided trapezial muscle spasm with positive left

Spurling."  (Tr. 628.)  Contrary to the Commissioner's argument (Def.'s Mot. Summ. J. at 4), this

evidence suggests that Plaintiff's left upper-extremity pain does "correspond" to her C6-C7 nerve

root or spinal cord compression.

The Court is aware of recent case law suggesting that Plaintiff has the burden of showing that

an ALJ's error is *not* harmless – at least where the prejudice from the error is not apparent.  *See*

---

[7](Def.'s Mot. Summ. J. at 4 n.1.)

*Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("Lower court cases make clear that courts have correlated review of ordinary administrative proceedings to appellate review of civil cases in this respect.  Consequently, the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").  In *McLeod v. Astrue*, the Ninth Circuit held that the Supreme Court's decision in *Sanders* applied to social security appeals and, in summarizing *Sanders*, noted, "Where harmfulness of the error is not apparent from the circumstances, the party seeking reversal must explain how the error caused harm."  640 F.3d 881, 887 (9th Cir. 2011).  The Appellate Court also explained, however,

> We infer from *Sanders* that, despite the burden to show prejudice being on the party claiming error by the administrative agency, the reviewing court can determine from the "circumstances of the case" that further administrative review is needed to determine whether there was prejudice from the error.  Mere probability is not enough. But where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency "can decide whether re-consideration is necessary."   By contrast, where harmlessness is clear and not a "borderline question," remand for reconsideration is not appropriate.

*Id.* at 888 (citations omitted).

Here, the ALJ did not comply with his duty to explain his findings at step three.  The Commissioner then failed to acknowledge *Reynolds*.  His argument that Plaintiff's pain, motor loss, and reflex loss are not "neuro-anatomically distributed" is contradicted, at least in part, by the medical evidence discussed above.  (*See* Def.'s Mot. Summ. J. at 4.)  Therefore, based on the "circumstances of the case, further administrative review is needed to determine whether there was prejudice from the error."  *See McLeod*, 640 F.3d at 888.  Remand at step three is therefore warranted.

23

### 2. *Plaintiff Has Not Shown That the ALJ Committed Reversible Error in Evaluating Her Credibility*

Plaintiff next claims that the ALJ erred in evaluating her credibility. According to Plaintiff, the ALJ provided a conclusory analysis that does not comport with the procedural requirement for an ALJ to explain his credibility findings. (Pl.'s Mot. Summ. J. 15-16.) Plaintiff points to a recent Seventh Circuit opinion which criticized the Social Security Administration's repeated use of "template" language in addressing a claimant's credibility:

> Reading the administrative law judge's opinion, we first stubbed our toe on a piece of opaque boilerplate near the beginning, where, after reciting Bjornson's description of her medical condition, the opinion states: "After careful consideration of the evidence, the undersigned [administrative law judge] finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." The government's brief describes this passage as a "template," by which it means a passage drafted by the Social Security Administration for insertion into any administrative law judge's opinion to which it pertains.
>
> This "template" is a variant of one that this court (and not only this court) had criticized previously—that "after considering the evidence of record, the undersigned finds that claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." In *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir.2010), we called this "meaningless boilerplate. The statement by a trier of fact that a witness's testimony is 'not entirely credible' yields no clue to what weight the trier of fact gave the testimony" (emphasis in original); *see also Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Martinez v. Astrue*, 630 F.3d 693, 696-97 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010). "Such boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible. More troubling, it appears that the Commissioner has repeatedly been using this same

24

> boilerplate paragraph to reject the testimony of numerous claimants, without linking the conclusory statements contained therein to evidence in the record or even tailoring the paragraph to the facts at hand, almost without regard to whether the boilerplate paragraph has any relevance to the case." *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (citation omitted).

*Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012) (Posner, J.).

Plaintiff is correct that in this case the ALJ used the boilerplate language questioned by the

Seventh Circuit:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 24.)

But, as the Commissioner argues, the ALJ went beyond this form language. In particular,

the ALJ provided several reasons for discounting Plaintiff's credibility:

> The claimant has a moderate case of carpal tunnel syndrome, necessitating only occasional use of her hands for gross and fine manipulation, which has been incorporated within the residual functional capacity assessment such that exacerbation of symptomatology does not occur. . . .

> The undersigned finds that the longitudinal treatment history reflects that the claimant has responded well to her counseling and psychotropic medication regimen, reflecting poorly upon her veracity in this matter. Dr. Angeles, in her Mental Health Source Statement found the claimant had only moderate limitations in her mental functioning. This evaluation has not changed over the years, with the claimant consistently showing GAF scores in the moderate range, not the severe range. . . .

> Dr. Podell felt the claimant's mental problems somatic, having a factitious disorder. He also felt the claimant was overstating her symptoms. The undersigned finds that the claimant has overstated

25

her symptoms.  The claimant alleged that she is compliant with medical protocol and treatment, yet despite Dr. Robertson's specific requirement, she quit smoking in order that he may fix her physical maladies with surgery, the claimant continues to smoke.  Given the assertion by the claimant of the dire need she has to fix her degenerative disc disease, which causes her such intense pain that she cannot concentrate or even work, one would consider that she would refrain from smoking in anticipation of surgical intervention to solve her back pain.  The fact that the claimant has not quit smoking is indicative that the claimant's allegations of pain are overstated and are less restrictive than alleged at the hearing. . . .

In addition, the record fails to indicate any significant side effects from medications, which would further affect the remaining residual functional capacity.

Finally, the undersigned carefully observed the claimant and notes that the claimant was not in any obvious pain or discomfort when walking in or out of the hearing room or while sitting during the course of the hearing.

(Tr. 28-30.)  Accordingly, the Court does not find that the ALJ inadequately articulated his credibility determination.

Plaintiff alternatively attacks the ALJ's credibility determination on substantial evidence grounds.  In particular, Plaintiff argues that the ALJ erred by, on the one hand, finding that "J. Alan Robertson M.D. . . . diagnosed claimant with trauma to her neck with resultant intervertebral disc extrusion, left, C6-7 producing C6-7 EMG-positive radiculopathy; trauma to low back activating aggravating preexisting L5-S1 'zygapophyseal joint osteoarthrosis' and producing low back pain," yet, on the other hand, finding that "the claimant's assertions of back pain, based on these findings, somewhat overstated and inflated.  While clearly there is pain, the level of pain is not supported by this record" (Tr. 28).  (*See* Pl.'s Mot. Summ. J. at 16-17.)  The ALJ's statement, "based on these findings," refers to the many imaging studies that provided for minimal, mild, or moderate encroachment on the neural foramen and mild or moderate disc bulging or herniation.  (*See* Tr. 28.)

In full, after summarizing the November 7 and November 19, 2009 imaging studies, the ALJ stated:

> The undersigned takes note that all three radiologists, Dr. Spickler, Dr. Bharat, and Dr. Bennett, found the claimant's disc bulging as mild or minimal. While there was moderate herniation at C6-C7, the herniation only caused mild compression of the ventral aspect of the spinal cord. Given the objective findings of three independent radiologists conducting MRI/CT testing of the claimant's spine, the undersigned finds the claimant's assertions of back pain, based on these findings, somewhat overstated and inflated. While clearly there is pain, the level of pain is not supported by his record.

(Tr. 28.) Plaintiff does not argue that the ALJ's description of Drs. Spickler, Bharat, and Bennett's imaging study findings is inaccurate. Rather, it appears that Plaintiff's position is that given Dr. Robertson's findings, the ALJ's reliance on the minimal/mild/moderate findings of the radiologists to discount Plaintiff's credibility constitutes reversible error.

The Court disagrees. Plaintiff testified that on good days she has 7-out-of-10 pain but on bad days she has pain exceeding level 10. (Tr. 121-22.) She also stated that she could only stand for "a few minutes." (Tr. 119.) Dr. Robertson's findings cited by the ALJ support these allegations. But the ALJ did not err in considering the results of the imaging studies as part of his credibility analysis. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a) ("In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, *the medical signs and laboratory findings* and statements about how your symptoms affect you." (emphasis added)). Nor was it inherently illogical for the ALJ to conclude that minimal, mild, or even moderate nerve root or spinal cord compression was contrary to Plaintiff's testimony that she experiences beyond 10-out-of-10 pain on bad days. Based on the same evidence, this Court might draw a different inference; but it is important to recall that this Court's ability to reverse an ALJ's credibility determination on non-procedural grounds is limited. *Jones v. Comm'r of Soc. Sec.*,

27

336 F.3d 469, 476 (6th Cir. 2003) (providing that a court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying."); *Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x. 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility determination face an uphill battle."). Given the nature of the MRI findings, the several other reasons the ALJ provided for discounting Plaintiff's credibility, which, importantly, are unchallenged by Plaintiff, and the deference this Court owes the ALJ's balancing of the evidence and evaluation of Plaintiff's credibility, the Court cannot conclude that the ALJ committed reversible error in discounting Plaintiff's claims of pain even in view of Dr. Robertson findings.

   *3. The ALJ Failed to Adequately Explain Why He Credited Medical Opinions of Record But Did Not Adopt Plaintiff-Favorable Limitations in those Opinions*

   Plaintiff next argues that the ALJ crafted an inaccurate residual functional capacity ("RFC") assessment. (Pl.'s Mot. Summ. J. at 16-18.) A claimant's RFC is the most the claimant can still do despite her limitations, S.S.R. 96-8p, 1996 WL 374184 at *2, and is used by the ALJ in determining whether a claimant can return to her past work (step four of the disability analysis) or perform other work (step five). In crafting a claimant's RFC, an ALJ is required to explain how the evidence supports the limitations that the ALJ selected for the claimant:

   NARRATIVE DISCUSSION REQUIREMENTS

   The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case

> record. The adjudicator must also explain how any material
> inconsistencies or ambiguities in the evidence in the case record were
> considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *6-7 (internal footnote omitted).[8]

Plaintiff argues that the ALJ failed to adequately explain why he credited both Dr.
Robertson's and Dr. Angeles' opinions but failed to include two of their specific limitations: (1) the
need to lie down during the day, and (2) the need to miss work three times per month. (*See* Pl.'s
Mot. Summ. J. at 16-18.) The Court agrees.

Regarding Plaintiff's need to lie down, Dr. Robertson provided:

> Ms. Barbera should avoid engaging [in] any resistance exceeding ten
> pounds whether this be lifting, pushing, pulling, carrying or the like.
> Ms. Barbera should also avoid repetitive motion activities involving
> her trunk especially activities requiring simultaneous movements into
> three planes such as forward bending, lateral bending[,] and rotation
> all combined as in shoveling snow and the like. *Ms. Barbera should
> also avoid prolonged sitting, she should alternate sit-stand-walk-
> recumbent activities throughout the day*.

(Tr. 729 (emphasis added).)

As Plaintiff correctly points out, the ALJ stated that Dr. Robertson's restrictions were
"reasonable given the objective medical evidence of record." (Tr. 29.) In fact, the ALJ went even
further: after reciting virtually all of Dr. Robertson's limitations quoted above, including the
recumbent limitation, the ALJ stated, "After a careful consideration of the entire record, the

---

[8]SSRs "are binding on all components of the Social Security Administration" and "represent
precedent final opinions and orders and statements of policy and interpretations" adopted by the
agency. 20 C.F.R. § 402.35(b)(1); *see also Evans v. Comm'r of Soc. Sec.*, 320 F. App'x 593, 596,
2009 WL 784273, at *2 (9th Cir. Mar. 25, 2009) ("'Federal statutes, administrative regulations and
Social Security Rulings together form a comprehensive scheme of legal standards that ALJs must
follow in determining whether a claimant is entitled to disability benefits.'" (quoting *Terry v.
Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990))).

undersigned finds that the claimant *is limited to the above parameters*, such that exacerbation of symptomology does not occur."  (Tr. 29 (emphasis added).)

However, the ALJ did not "limit[]" Plaintiff "to the above parameters"; he specifically omitted Dr. Robertson's provision that Plaintiff alternate between "sit-stand-walk-recumbent activities throughout the day."  (*See also* Pl.'s Mot. Summ. J. at 17 ("[D]espite finding that the doctor's listed restrictions were 'reasonable,' the ALJ did not incorporate the doctor's restrictions which included that the plaintiff 'should also avoid prolonged sitting; she should alternate sit-stand-walk-*recumbent*[9] activities throughout the day.'" ).)

Standing alone, the Court would be reluctant to remand on this inconsistency.  As the Commissioner argues, Dr. Robertson's limitation is vague.  In particular, he did not specify how often or how long Plaintiff would need to lie down.  For example, Dr. Robertson did not provide that lying down once during the workday (e.g., during a lunch break), along with lying down before and after work, would not suffice.  Also, Dr. Robertson did not state that Plaintiff would not be able to work for eight hours absent lying down during the day (but with alternating sitting/standing/walking) – he merely provided that Plaintiff "should alternate sit-stand-walk-recumbent activities throughout the day."

But the Court is further troubled by the ALJ's omission of Dr. Angeles' work-absences restriction.  In August 2009, Dr. Angeles provided, albeit on a checkbox form, that Plaintiff would "likely be absent from work as a result of impairments, symptoms, treatment needs and medical

---

[9]In Plaintiff's brief, the word "recumbent" – every time it appears – is bolded, italicized, and underlined.  Counsel extensively uses all three type-face modifiers to show emphasis.  In a prior Report and Recommendation, this Court informed counsel that extensive and repeated emphasis does not aid the Court in its review and, in fact, can distract from it.  *See* Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 122 (1st ed. 2008).

problems [3 times] per month" (*Id.*)  In addressing Dr. Angeles' opinion, the ALJ stated:

> On August 7, 2009, a Mental Health Source Document was completed by Dr. Angeles, who diagnosed claimant with Axis I, major depression, recurrent, moderate, with a GAF of 55 (Exhibit 26F). The objective and other substantial evidence of record supports this opinion and the undersigned gives it "great" weight as later discussed.

(Tr. 25.)

The Court agrees with Plaintiff that it was improper for the ALJ to give Dr. Angeles' opinion "great" weight and yet exclude the work-absences limitation without providing an explanation for the omission.  (*See* Pl.'s Mot. Summ. J. at 16.)  An ALJ is generally not free to cherry pick those portions of an opinion that disfavor a claimant, and the practice is even more questionable without some explanation as to why claimant-favorable portions were found not credible.  *See Davis v. Comm'r of Soc. Sec.*, No. 10-14518, 2011 WL 7330518, at *8 (E.D. Mich. Oct. 27, 2011) *report adopted by* 2012 WL 511937 (Feb. 16, 2012) ("Despite [the ALJ's statement that he gave 'great weight' to [the state agency physician's] opinion, the ALJ did not so much adopt the findings as 'cherry pick' the portions that supported a non-disability finding and ignore the rest.").

The Commissioner responds that Dr. Angeles – who saw Plaintiff only once or twice – is not a treating source because of the absence of the requisite longitudinal relationship.  That is probably so, *see Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006), but the ALJ himself found that Dr. Angeles' opinions should nonetheless be credited.  In addition to the "great weight" portion of the ALJ's narrative quoted immediately above, the ALJ provided:

> On May 6, 2009, Bernadette Angeles, M.D. performed an initial evaluation at St. John Health Center.   The claimant had mild-moderate impairment in her concentration and a mild impairment in her memory. . . .  Dr. Angeles diagnosed the claimant with major depressive disorder, recurrent, moderate; rule out

31

generalized anxiety disorder; a cognitive impairment due to a closed head injury and her Global Assessment of Functioning (GAF) was 55 and had been 55 for the prior 12 months.

A GAF from 51 to 60 is indicative of "moderate" symptoms . . . .

*Dr. Angeles is the claimant's treating source and while this is an initial evaluation of the claimant, however, given the treating relationship between the claimant and Dr. Angeles, the undersigned assesses the medical opinion of Dr. Angeles with "great" weight.* The undersigned notes specifically that it is Dr. Angeles opinion that the claimant has been stable in her mental health at a moderate level of impairment for the previous 12 months.

(Tr. 24-25 (emphasis added).)   Once the ALJ determined that Dr. Angeles' initial May 2009

evaluation, and her subsequent, August 2009 opinion, were both entitled to "great" weight, the ALJ

owed Plaintiff and the Court an explanation as to why Dr. Angeles' functional limitations were not

adopted.  *See Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) (quoting *Diaz*

*v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) with approval for the proposition that an "ALJ may not

select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some

minimum level, his analysis of the evidence to allow the appellate court to trace the path of his

reasoning."); *Pollaccia v. Comm'r of Soc. Sec.*, No. 09-cv-14438, 2011 WL 281044, at *6 (E.D.

Mich. Jan. 6, 2011) *report adopted by* 2011 WL 281037 (E.D. Mich. Jan. 25, 2011) ("'[A] court may

not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the

decision fails to provide an accurate and logical bridge between the evidence and the result.'"

(quoting *Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1080 (E.D. Wisc. 2009))); *Grandchamp v. Comm'r*

*of Soc. Sec.*, No. 09-cv-10282, 2010 WL 1064144, at *10 (E.D. Mich. Jan. 25, 2010) *report adopted*

*in relevant part by* 2010 WL 1064138 (E.D. Mich. Mar. 22, 2010) ("'While the ALJ is not required

to address every piece of evidence, he must articulate some legitimate reason for his decision.  Most

32

importantly he must build an accurate and logical bridge from the evidence to his conclusion.'"
(quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000))).

The Commissioner also argues that "by explaining the reasons he accepted Dr. Angeles'
findings of moderate symptoms, the ALJ implicitly rejected the doctor's conclusory form alleging
disabling limitations." (Def.'s Mot. Summ. J. at 9.) More specifically, the Commissioner provides
that the ALJ

> observed that [Dr. Angeles'] moderate-symptom finding[s] [were]
> consistent with "[t]he objective other substantial evidence of record,"
> and in particular with the GAF score assigned by Dr. Podell after a
> thorough neuropsychiatric evaluation. (Tr. 25). The ALJ also found
> that Plaintiff had responded well to counseling and medication, and
> that Plaintiff overstated her symptoms (Tr 29-30.)

(*Id.*) The Commissioner may be correct that the ALJ adequately explained why he credited Dr.
Angeles' moderate findings. But this provides little insight into why he rejected the work-absences
limitation. There is nothing plainly inconsistent with moderate symptoms and three work absences.
It is clear that Dr. Angeles, whose opinions the ALJ assigned "great" weight, did not think the two
were inconsistent.

In short, absent an explanation from the ALJ, this Court must impermissibly speculate as to
why the ALJ implicitly excluded limitations from Dr. Angeles' August 2009 opinion despite giving
that opinion, and Dr. Angeles' May 2009 evaluation, "great" weight. Further, even though the ALJ
may have had a reasonable interpretation of Dr. Robertson's opinion that permits exclusion of a
recumbent limitation, this interpretation was not shared with Plaintiff or the Court. It is not the
Court's role to discern post-hoc explanations that rationalize the ALJ's decision. Remand for this

reason as well is therefore warranted.[10]

### 4.  *Plaintiff's Request for Sentence-Six Remand Is Moot*

Plaintiff has attached two post-administrative-decision mental evaluations to her Motion for Summary Judgment.  Plaintiff argues that these evaluations warrant remand pursuant to sentence six of 42 U.S.C. § 405(g), which provides, "The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."

But Plaintiff also clarifies that her sentence-six remand request is in the alternative: "Plaintiff requests this Court to remand this case under Sentence 4 of the Regulations, if a full reversal of the hearing decision cannot be made at the District Court level.  However, *if such a remand is not possible*, plaintiff would request a remand pursuant to Sentence 6 of the Act . . . ."  (Pl.'s Mot. Summ. J. at 20 (emphasis added).)  The Court recommends remand pursuant to sentence four. Accordingly, Plaintiff's request for remand pursuant to sentence six is moot.

### G.  Conclusion

For the foregoing reasons, this Court finds that the Administrative Law Judge failed to adequately explain why Plaintiff's impairments do not meet or medically equal Listing 1.04A and why he credited two physicians opinions yet did not adopt certain Plaintiff-favorable functional

---

[10]The Court has considered whether the ALJ's failure to articulate was harmless.  While it is possible, with explanation, that substantial evidence supports the ALJ's treatment of the opinion evidence, it is not obviously so.  Plaintiff points out that the VE testified that more than two work absences per month would preclude work.  Further, the need to lie down during the work day may be work preclusive.

The Court further notes that the ALJ is free to reassess Plaintiff's credibility upon a second review of Drs. Robertson and Angeles' limitations.

limitations in those opinions.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson_____
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  June 5, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on June 5, 2012.

s/Jane Johnson_____
Deputy Clerk